UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DERWIN SUCCESS,

                Plaintiff,

v.

MATTHEW MACAULEY et al.,

                Defendants.

_____/

Case No. 1:21-cv-254

Honorable Paul L. Maloney

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Rule 21 of the Federal Rules of Civil Procedure provides that, on motion by a party or on its own motion, the Court may at any time drop or add parties or sever a claim on grounds of misjoinder. *Id.* Applying that standard, the Court will dismiss without prejudice Plaintiff's claims against Defendants Macauley, Blackman, McBride, Hadden, Normington, Ferris, Neimic, Jones, Kowatch, Garza-Martin, Langdon, and Sices, because they are misjoined. The Court also will dismiss as misjoined all of Plaintiff's claims against Defendants Otterbein, Johnson, Conklin, Gose, and Parrish that occurred after February 28, 2018.

Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. § 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly

irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Parrish, Gose, and Conklin.  The Court will also dismiss, for failure to state a claim, Plaintiff's equal protection, Eighth Amendment, and retaliation claims against remaining Defendants Otterbein and Johnson.

## Discussion

### I.      Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Oaks Correctional Facility (ECF) in Manistee, Manistee County, Michigan.  The events about which he complains, however, occurred at the Bellamy Creek Correctional Facility (IBC) in Ionia, Ionia County, Michigan.  Plaintiff sues the following IBC officials:  Acting Deputy Warden / Acting Warden Matthew Macauley; Assistant Deputy Warden (ADW) L. Blackman; Acting ADW James McBride; Residential Unit Manager (RUM) Brian J. Hadden; Acting RUM Laura M. Normington; Prisoner Counselor (PC) / Acting RUM Lynn J. Parrish; Correctional Officer (CO) / Chaplain Unknown Otterbein; CO / Acting PC Kayla Johnson; COs Unknown Gose, Unknown Conklin, Unknown Ferris, Unknown Neimic, Unknown Jones, A. Kowatch, and Unknown Garza-Martin; Health Care Unit Manager (HUM) Josh Langdon; and Doctor Peter E. Sices.

Plaintiff alleges several sets of events between January 5, 2017, and October 1, 2019, a period of two years and nine months.  In his first set of allegations, Plaintiff complains about how he was treated in his religious-representative position after IBC Chaplain Daniel Thompson retired.  Plaintiff alleges that he holds a doctorate in psychology and theology, as well as two masters degrees in counseling and communication.  He contends that he has been a model prisoner and was appointed by now-retired IBC Chaplain Daniel Thompson to serve as the

religious representative and Bible tutor for the prison's Protestant Church from 2009 through November 28, 2017.  He also held the prison job of lead-line kitchen worker from February 2009 through April 2019, except for an 8-month gap from April through December 2010.

Beginning on January 5, 2017, a church volunteer at the prison, Peter Vander Jagt,[1] began to disparage Plaintiff's preaching for the prison's protestant church services.  Vander Jagt compared Plaintiff's preaching to that of Rev. Jim Jones and David Koresh.  Plaintiff claims that Vander Jagt's harassment was severe, and he contends that it must have been induced by unspecified correctional officers and other staff.  Plaintiff bases his claim that officers induced the harassment on a warning Plaintiff received from retiring Chaplain Thompson to "Watch out for C/O Conkin!"  (Compl., ECF No. 1, PageID.7.)

Plaintiff complains that Vander Jagt repeatedly gave sermons to other prisoners that defamed Plaintiff and otherwise censored prisoners' testimony of faith to exclude any reference to Plaintiff having counseled them or assisted them.  This alleged religious discrimination by Vander Jagt continued until at least August 2017.  On July 20, 2017, Vander Jagt allegedly shared with Plaintiff his own two-page typewritten response[2] to questions from other prisoners about why Plaintiff was not being allowed to preach.  The response included the following assertion:

> Officers and the local prison, in general, are portrayed in his [Plaintiff's] remarks as having too much latitude in terms of setting policy when, in actuality, they have their own set of rules they must follow to remain employed.  This has the effect of isolating prisoner[]s from the direction of officers until they "cross a line" with their behavior and discipline has to be administered.

(*Id.*, PageID.8.)

---

[1] Vander Jagt, a private citizen, is not a defendant in the instant action.

[2] Plaintiff claims that the pages were smuggled into the prison and constituted contraband.

CO Blaunt (not a defendant), who was the temporary acting chaplain, shouted at Plaintiff, "'You are f**king with me because I am young and white,' and 'You will never be allowed to be a Religious Representative as long as I am chaplain[.]'" (*Id.*, PageID.8.) Defendant Otterbein, who would shortly replace Blaunt as acting chaplain, also used obscenities, "rebuking [Plaint]iff for his alleged wrongdoings." (*Id.*)

Plaintiff vaguely complains that "simultaneously" his cell was routinely ransacked, though he does not identify a single incident. He alleges that the new chaplain, Defendant Otterbein, engaged in racial and religious harassment. On an unspecified occasion, Plaintiff asked Otterbein why she had destroyed his cell, and she responded, "I don't remember!" (*Id.*, PageID.7.) She added, "I can't work with 'someone' like you!" (*Id.*) From the context of the complaint, Defendant Otterbein made this statement shortly after she became the new chaplain on approximately October 1, 2017. (*Id.*) In addition, Defendant Conklin, allegedly threw Plaintiff's religious item on the floor on one unspecified occasion and placed a padlock on Plaintiff's locker that he refused to remove before he went home at 10:00 p.m.

On October 1, 2017, Defendant Otterbein went from cell to cell telling prisoners who valued Plaintiff's "Miracle Ministry" that Plaintiff "would either lead them off a cliff or into a ditch." (*Id.*, PageID.8.) Otterbein also allegedly told prisoners that Defendants Johnson and Gose were close personal friends of hers, who would be helping her to silence Plaintiff. On both November 16, and November 23, 2017, Defendants Johnson and Gose refused to timely release Plaintiff for church, forcing him to be late. Later that evening, Defendant Johnson summoned Plaintiff to the pod for interrogation about why Plaintiff was leading religious services. Plaintiff informed Johnson that former-Chaplain Thompson had appointed him in 2009, according to policy. Defendant Johnson told Plaintiff that she wanted someone else to be chaplain. On the way back to his cell, Plaintiff stopped at a white prisoner's (St. Andre's) cell. St. Andre, who had

substituted for Plaintiff and assisted in providing services when Thompson was the chaplain, told Plaintiff that he was replacing Plaintiff as chaplain.  (*Id.*, PageID.9.)  Defendant Otterbein also allegedly taunted Plaintiff by saying, "THE SUCCESS SHOW IS OVER!!!"  (*Id.*)

Plaintiff alleges that his replacement as religious representative marked the beginning of a three-year campaign of harassment of treating Plaintiff differently than white prisoners by not extending him the same courtesies.  On November 27, 2017, Plaintiff sent kites complaining about his removal from the religious-representative position and the alleged religious and racial discrimination and harassment to Defendants Parish and Otterbein.  Five days later, he received word that Defendant Otterbein was, as reported, replacing Plaintiff with prisoner St. Andre in the religious-representative position.

On November 30, 2017, Plaintiff wrote to Defendant Otterbein, seeking reinstatement to the position because he had far superior educational and experiential qualifications and superior speaking abilities to those of St. Andre.  Defendant Otterbein visited Plaintiff on December 7, 2017, advising Plaintiff not to write her again and repeating that the "Success Show" was over.  (*Id.*, PageID.9.)

On December 4, 2017, during a shakedown of Plaintiff's cell, Defendant Johnson found a self-help book authored by Plaintiff for African-American prisoners.  Plaintiff claims that the book was intended to promote self-improvement and personal development.   Johnson, however, interpreted the book as an attempt to promote radical black ideologies and confiscated it.  Johnson allegedly told white prisoners that Plaintiff had written an "'anti-white' book" and that staff needed to "'put Plaintiff in his place'" because Plaintiff believed himself to be "'better than them.'"  (*Id.*)  Plaintiff alleges that the remarks were reckless and that Johnson also accused Plaintiff of being a snitch in front of other prisoners.

Plaintiff subsequently successfully changed his religious affiliation to Christian Science, ostensibly because he wanted to distance himself from the perceived unfairness and scrutiny.  Concerned that Plaintiff intended to split the Protestant religious group and gain authority in the new sect, Defendant Otterbein told Christian Science members not to recruit members of the Protestant church.  One month after Plaintiff changed his religion, on February 28, 2018, Defendant Otterbein informed Plaintiff that Christian Science services were being cancelled due to a lack of membership.

Plaintiff's next set of allegations does not begin until nearly six months later.  In the interim, Plaintiff alleges that he largely kept himself isolated, due to his preceding misfortunes. Plaintiff states that he continued to counsel individual prisoners out of sight of correctional officers.  Defendant Ferris became suspicious of Plaintiff's activities, and Defendant Conklin urged Ferris to fire Plaintiff, using derogatory language.  On August 18, 2018, Defendant Ferris issued an allegedly false work evaluation, recommending that Plaintiff be fired from his long-held food service position.  Plaintiff wrote to Defendant Parrish, indicating that Plaintiff's last work report, issued only one week before, had given his performance the highest possible score.  Plaintiff retained his job.

That same day, Defendant Conklin informed Plaintiff that he could no longer take his Bible out of his cell for any reason, including work, yard, and church.  Plaintiff alleged that other prisoners were permitted to take their Bibles, but Defendant Conklin threatened to put Plaintiff in segregation if he did the same.  Plaintiff continued to secretly carry his Bible for self-study on breaks.  Days later, Conklin called Plaintiff to the officers' pod and berated him, calling Plaintiff an atheist and a nigg*r.  Conklin also enlisted the support of Defendants Ferris and Neimic, who had already enlisted Defendant Normington.  Plaintiff contends that these four Defendants disparaged him and ordered him to do extra work in an attempt to break him.

6

In his third set of allegations, Plaintiff alleges that, on December 31, 2018, Defendants Johnson and Jones took part in a premeditated physical assault on Plaintiff. According to Plaintiff, Defendant Jones keyed open Plaintiff's door to release him from his cell for work. As Plaintiff was exiting his cell, Defendant Johnson, who was positioned in the officers' pod, slammed shut all cell doors on the floor, including Plaintiff's. Plaintiff was pinned and crushed in the door until Defendant Jones could come to key the door open. Plaintiff suffered injuries to his head, neck, and spine, a lacerated and dislocated right ring finger, and a dislodged tooth. Plaintiff immediately reported his injuries to Defendants Jones and Johnson, but neither defendant completed a prisoner injury report or allowed health service to be called. Instead, Defendant Johnson gave Plaintiff two small band-aids and ordered him back to work. Jones told Plaintiff that, if he could move his fingers and hand, they were not broken.

Plaintiff sent multiple kites to health care over the next two weeks. On January 2, 2019, he typed a kite to health care, but he admits that he did not put his kite on the required form. He sent another kite, this time on the form, on January 12, 2019, which resulted in a visit with Nurse Ritz (not a defendant) on January 17, 2019. Based on the evaluation of Nurse Practitioner (NP) Schad (not a defendant), Ritz ordered x-rays of Plaintiff's upper spine and neck. She did not, however, order x-rays of his finger and hand. Later that day, Nurse Ritz visited Plaintiff's cell with Defendant Neimic and asked Neimic to complete the Prisoner Injury Report, so that Plaintiff would be excused from paying his $5 co-pay. Two days later, Plaintiff encountered Defendant Dr. Sices on his unit. Plaintiff informed Sices of his injuries and requested a medical pillow, neck brace, and heating pad. Sices denied the requests but advised Plaintiff that he was lucky to be able to walk and was likely to have problems for the rest of his life as a result of the incident.

Plaintiff sent a letter to Defendant ADW Blackman on January 21, 2019, complaining about the injury and the lack of medical care. On January 22, Plaintiff received a

diagnosis from Dr. Michael Henderson of muscle strain of the cervical spine, compounded by a prior fusion of disks C4 and C5.  Plaintiff received literature on soft-tissue injuries and was instructed about stretching exercises.  Plaintiff alleges that he continued to have pain and insomnia resulting from the accident.

Because of his continuing pain, Plaintiff submitted another kite on January 31, 2019.  He received more literature on muscle strains and was scheduled for a nurse call-out on February 7, which was later cancelled.  When Plaintiff complained to Defendant ADW Blackman about not receiving a visit, Blackman told Plaintiff that he was too busy to respond to Plaintiff's complaints.  But Blackman met with prisoner Galeski, who bragged to Plaintiff that Blackman always had time to visit him on his weekly rounds.  On February 12, 2019, Plaintiff finally asked Nurse Ritz for a detail laying him in from work.  She refused his request, because only a higher-level medical provider could issue such a detail.  Yet, according to Plaintiff, two of his white coworkers, prisoners Kilpatric and Schneider, had been laid in by a nurse only two weeks before. Nurse Ritz scheduled Plaintiff for a visit with the doctor.

On February 1, 2019, Defendant Johnson allegedly slammed down some paperwork and forced Plaintiff to sign without reading it, saying that Plaintiff was going to pay now or pay later.  When Plaintiff returned to his cell, he found a notice of intent to make him pay the $5 medical co-pay, which contained Plaintiff's allegedly forged signature.  Defendant Johnson informed Plaintiff that he would be out of luck if he called Nurse Ritz about having to pay the $5 for his February 12 appointment, because he was not technically at work when he was injured in the door.  On February 20, 2019, Plaintiff received Defendant Johnson's order that the $5 be removed from Plaintiff's account.  Plaintiff appealed, contending that Defendant Johnson had a conflict of interest, but his appeals were denied.

Plaintiff's scheduled doctor visit for March 4, 2019, was cancelled.  Plaintiff sent an urgent medical request, and another visit was scheduled for March 8.  Defendant Dr. Sices again failed to show up, but Physician's Assistant (PA) Simon examined Plaintiff's injuries and conducted a concussion test and a neck side-bending test.  The results led PA Simon to issue a one-week medical detail, limiting Plaintiff's work activity to pushing or lifting no more than 10 pounds.  This would have relieved Plaintiff from pushing 400-pound carts during his kitchen duties, but the guards denied knowledge of the detail from March 8 to March 20, 2019.  Defendants Kowatch and Garza-Martin later admitted to having possessed the detail all along, but they forced Plaintiff to work beyond his restrictions anyway.

Plaintiff kept complaining to health care, submitting kites on March 10, 13, and 19, 2019, and April 7, and 21, 2019.  Plaintiff finally received a copy of the medical detail issued by PA Simon on March 8, 2019.  On March 25, 2019, Nurse Freiburger again issued a special accommodation notice restricting his pushing and lifting.  Plaintiff saw NP Schad on April 11, and he asked for a modification of the medical restriction to no pushing and no lifting.  Schad denied the request but issued a 30-day "No Work Assignment."  (*Id.*, PageID.13.)  Plaintiff was terminated from his job on April 17, 2019, as medically unemployable.

Plaintiff filed a grievance on April 24, 2019, seeking reinstatement to his job and back pay.  Defendant Hadden met with Plaintiff about the grievance on April 25, 2019.  Plaintiff complains that Defendant Hadden deliberately met in the dark and hammered and punched his desk for the entire meeting, repeatedly stating, "[B]ullsh*t."  (*Id.*)  Defendant Hadden offered to waive Plaintiff's $5 copay and return Plaintiff to his lead job position in food services, if Plaintiff signed off on the grievance.  Plaintiff refused.  Hadden threatened to transfer Plaintiff from protective custody back to general-population housing.

Plaintiff filed another grievance that same day, based on Defendant Johnson's alleged misconduct in response to a letter Plaintiff sent on April 22, 2019, including telling other prisoners about the letter and Johnson's rumored attempts to have Plaintiff transferred back to Oaks Correctional Facility, where Plaintiff was in danger from a white-supremacist group. Defendant Hadden addressed the grievance at Step I.  Hadden threatened to tell other officers to lie and to forewarn health services about Plaintiff's "bullsh*t injuries."  (*Id.*, PageID.14.)

Plaintiff filed yet another grievance on April 29, 2019, complaining of the failure of Defendants Johnson and Jones to report Plaintiff's injury within 24 hours.  The grievance was rejected at all three steps as untimely.  Plaintiff also sent a letter to Defendant Hadden on May 2, 2019, concerning Hadden's alleged misconduct during the April 25 grievance review.  He also filed a grievance against Hadden on May 7, 2019, complaining about the threat to transfer Plaintiff to general population.  At Step I, Hadden denied making the threat.  Defendant McBride admitted that Hadden should be held accountable for the manner of his interview, but he accused Plaintiff of being paranoid and suggested that Plaintiff perhaps should be sent to general population.  Plaintiff's grievance was rejected at Steps II and III, despite Plaintiff mentioning McBride's comments.

On May 13, 2019, Plaintiff filed a grievance against Defendants Garza-Martin, Kowatch, Neimic, and Ferris for hiding or not disclosing Plaintiff's first medical detail, causing Plaintiff's injuries to be exacerbated.  The grievance was denied at Steps I and II, and Plaintiff did not receive an answer at Step III.

On May 23, Plaintiff sent a letter to McBride and filed a grievance alleging racially abusive mistreatment by Hadden at the April 25 grievance review.  During the Step-I grievance review, Defendant Hadden accused Plaintiff of being paranoid, and Defendant Blackman denied the grievance on the merits.  The grievance also was denied at Steps II and III.

Plaintiff began kiting health services again on May 9, 2019, when he advised that his pain was now extending down his hip and right leg.  Plaintiff was told that he was on a wait-list to see a provider, and he was provided information about sciatica.  Plaintiff filed a grievance on May 30, alleging that Defendant HUM Langdon had been deliberately indifferent to his medical needs by delaying an appointment with a medical provider.  Plaintiff's grievance was denied at all steps.

Plaintiff was on the call-out list for health care for June 2, 2019, but he was skipped over.  He immediately requested that his appointment be rescheduled.  On June 8, 2019, NP Hilda Mbidzo issued a two-month light-duty detail and ordered Naprosyn for pain management.  Plaintiff was not content, complaining that Naprosyn was not a real pain reliever and that he wanted to see a physician.  He also asked that he be referred to a specialist and complained that he had not received a copy of his medical detail.  On June 11, he was seen by Defendant Nurse Ritz, who told him that he could purchase naproxen at the prisoner store and that he could send another kite if the naproxen did not work.

Plaintiff filed a grievance against Defendant Dr. Sices on June 11, 2019, complaining of Sices' repeated cancellations of doctor appointments.  At Step I, the grievance responder indicated that Plaintiff's appointments had been canceled in order to address more urgent prisoner needs.  Plaintiff responded that Defendant Sices had managed to see two of Plaintiff's white neighbors on June 2.  In the Step-II response, Sices indicated that he had an urgent need to be elsewhere.  The grievance was denied at all steps.  Plaintiff contends that the denials amounted to a cover-up.

On August 2, 2019, Plaintiff submitted two joint staff-corruption/racial-harassment grievances directly to Lansing, ostensibly because he was in fear of retaliation.  One grievance complained of the conduct of Defendant Chaplain Otterbein, and the other complained of the

11

actions of Defendants Johnson and Gose.  Plaintiff also wrote Defendant Macauley on August 14, complaining about the allegedly racist actions of Defendant Conklin.  Plaintiff received no responses.

On October 1, 2019, Plaintiff was transferred from his single-man cell at IBC back to an allegedly dangerous double cell at ECF.  Plaintiff alleges that the transfer was taken in retaliation for his grievances and complaints about his treatment.  Plaintiff also alleges that his typewriter was intentionally damaged during transfer.  Plaintiff filed grievances about the transfer and property damage.  The grievance was rejected at Step I as untimely and was rejected at Step II because the reasons for the transfer were part of a one-for-one prisoner exchange involving a prisoner that IBC could not accommodate.

Plaintiff notes that he was seen in health care at ECF shortly after his arrival and his back was x-rayed, showing mild levoscolisis at L2, which Plaintiff attributes to being shut in the cell door on December 31, 2018.  Plaintiff complains that Dr. Henderson previously diagnosed his injuries as mild muscle strain of the cervical spine near the spinal fusions at C4 and C5.  ECF mental health providers also diagnosed post-traumatic stress disorder, which Plaintiff believes was caused by his experiences at IBC, and he receives ongoing mental health care.  Plaintiff adds, however, that ECF officials are not providing adequate care.

Plaintiff alleges that various Defendants violated his right to practice his religion: (1) Defendant Conklin deprived him of his First Amendment right to practice his religion by preventing his ability to self-study outside his cell; (2) Defendants Conklin, Johnson, Gose, Otterbein, Ferris, Normington, and Neimic conspired to deprive him of his religious worship; (3) Defendants Parrish and Blackman violated his right to freely practice his religion when they failed to respond to Plaintiff's written request for investigation and discipline of Defendants Johnson and Gose; (4) Defendant Otterbein sabotaged the development of the Christian Science

12

religion and then canceled religious services; and (5) Defendant Macauley failed to respond to Plaintiff's request for investigation and discipline of Defendants Conklin, Johnson, and Otterbein.

Plaintiff also alleges that various Defendants violated his First Amendment right to access the courts over the course of nearly three years:  (1) Defendants Conklin, Johnson, Gose, and Otterbein engaged in a campaign of harassment in retaliation for Plaintiff having objected to Vander Jagt's allegedly defamatory comments about Plaintiff; (2) Defendant McBride failed to correct and actually encouraged the alleged misconduct of Defendant Hadden; and (3) Defendants Hadden, Johnson, McBride, and Macauley retaliated against Plaintiff by first threatening to transfer Plaintiff back to ECF and later acting on those threats, based on Plaintiff's use of the grievance process.

In addition, Plaintiff alleges a series of Eighth Amendment violations over the course of these events:  (1) Defendants Conklin, Johnson, Gose, Otterbein, Ferris, and Parrish subjected him to a campaign of harassment; (2) Defendant Johnson intentionally closed Plaintiff's cell door on him; (3) Defendant Jones conspired with Defendant Johnson to close the cell door on Plaintiff; (4) Defendant Johnson created a serious risk to Plaintiff by informing other prisoners about Plaintiff's self-help book and calling him a snitch; (5) Defendant Johnson acted with deliberate indifference by not promptly completing the prisoner injury report; (6) Defendant Blackman failed to investigate the misconduct by Johnson and Sices; (7) Defendant Hadden failed to act on Plaintiff's staff-corruption grievance against Defendant Johnson; (8) Defendants Garza-Martin, Kowatch, Neimic, and Ferris hid Plaintiff's work restriction, causing further risks of injury; (9) Defendants Sices and Langdon acted with deliberate indifference by repeatedly ignoring or denying Plaintiff's requests to be seen by a doctor.

Further, Plaintiff alleges that Defendants violated his right to equal protection by treating him differently than white prisoners:  (1) Defendant Otterbein removed Plaintiff from his

religious-representative position and replaced him with St. Andre, who was white; (2) Defendants

Johnson and Gose treated Plaintiff differently than white prisoners when they revoked unspecified

privileges; (3) Defendant Conklin discriminated against Plaintiff by repeatedly calling him a

"nigg*r" and unfairly preventing Plaintiff from possessing his Bible outside his cell, while other

prisoners were allowed to possess theirs; and (4) Defendant Ferris conspired with Defendant

Conklin to racially discriminate against Plaintiff to have him fired from his kitchen job without

reason.

Finally, Plaintiff alleges that his due process rights were violated in two ways:

(1) Defendant Johnson acted as a hearing officer on a notice of intent to take a $5 co-pay from

Plaintiff's account to treat injuries caused by Johnson himself; and (2) Defendants Hadden,

Johnson, McBride, Parrish, and Macauley had Plaintiff transferred to another prison for non-

disciplinary reasons, knowing that the other prison provided allegedly significant and atypical

conditions, including less pleasant housing, less access to the library and gym, and greater conflict

between and among prisoners and staff.

Plaintiff seeks declaratory and injunctive relief, together with compensatory and

punitive damages.

## II.    Misjoinder

Federal Rule of Civil Procedure 20(a) limits the joinder of parties in a single

lawsuit, whereas Federal Rule of Civil Procedure 18(a) limits the joinder of claims.  Rule 20(a)(2)

governs when multiple defendants may be joined in one action: "[p]ersons . . . may be joined in

one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in

the alternative with respect to or arising out of the same transaction, occurrence, or series of

transactions or occurrences; and (B) any question of law or fact common to all defendants will

arise in the action."  Rule 18(a) states provides as follows:  "A party asserting a claim . . . may

join, as independent or alternative claims, as many claims as it has against an opposing party."

Courts have recognized that, where multiple parties are named, as in this case, the

analysis under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there
> is more than one party on one or both sides of the action.  It is not concerned with
> joinder of claims, which is governed by Rule 18.  Therefore, in actions involving
> multiple defendants Rule 20 operates independently of Rule 18. . . .

> Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in
> a single action only if plaintiff asserts at least one claim to relief against each of
> them that arises out of the same transaction or occurrence and presents questions of
> law or fact common to all.

7 Charles Allen Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure Civil*

§ 1655 (3d ed. 2001), *quoted in Proctor v. Applegate*, 661 F. Supp. 2d 743, 778 (E.D. Mich. 2009),

*and Garcia v. Munoz*, No. 08-1648, 2008 WL 2064476, at *3 (D.N.J. May 14, 2008); *see also*

*United States v. Mississippi*, 380 U.S. 128, 142–43 (1965) (joinder of defendants is permitted by

Rule 20 if both commonality and same transaction requirements are satisfied).

Therefore, "a civil plaintiff may not name more than one defendant in his original

or amended complaint unless one claim against each additional defendant is transactionally related

to the claim against the first defendant and involves a common question of law or fact." *Proctor*,

661 F. Supp. 2d at 778 (internal quotation omitted).  When determining if civil rights claims arise

from the same transaction or occurrence, a court may consider a variety of factors, including, "'the

time period during which the alleged acts occurred; whether the acts . . . are related; whether more

than one act . . . is alleged; whether the same supervisors were involved, and whether the

defendants were at different geographical locations.'"  *Id.* (quoting *Nali v. Mich. Dep't of Corr.*,

No. 07-10831, 2007 WL 4465247, at *3 (E.D. Mich. Dec. 18, 2007)).

Permitting the improper joinder in a prisoner civil rights action also undermines the purpose of the PLRA, which was to reduce the large number of frivolous prisoner lawsuits that were being filed in the federal courts.  *See Riley v. Kurtz*, 361 F.3d 906, 917 (6th Cir. 2004).  Under the PLRA, a prisoner may not commence an action without prepayment of the filing fee in some form.  *See* 28 U.S.C. § 1915(b)(1).  These "new fee provisions of the PLRA were designed to deter frivolous prisoner litigation . . . 'by making all prisoner [litigants] . . . feel the deterrent effect created by liability for filing fees.'"  *Williams v. Roberts*, 116 F.3d 1126, 1127–28 (5th Cir. 1997) (quoting *Jackson v. Stinnett*, 102 F.3d 132, 136–137 (5th Cir. 1996)).  The PLRA also contains a "three-strikes" provision requiring the collection of the entire filing fee after the dismissal for frivolousness, etc., of three actions or appeals brought by a prisoner proceeding in forma pauperis, unless the statutory exception is satisfied.  28 U.S.C. § 1915(g).  The "three strikes" provision was also an attempt by Congress to curb frivolous prisoner litigation.  *See Wilson v. Yaklich*, 148 F.3d 596, 603 (6th Cir. 1998).

The Seventh Circuit has explained that a prisoner like plaintiff may not join in one complaint all of the defendants against whom he may have a claim, unless the prisoner satisfies the dual requirements of Rule 20(a)(2):

> Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that [a multi]-claim, [multi]-defendant suit produce[s] but also to ensure that prisoners pay the required filing fees—for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g) . . . .

> A buckshot complaint that would be rejected if filed by a free person—say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions— should be rejected if filed by a prisoner.

16

*George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007); *see also Brown v. Blaine*, 185 F. App'x 166, 168–69 (3d Cir. 2006) (allowing an inmate to assert unrelated claims against new defendants based on actions taken after the filing of his original complaint would have defeated the purpose of the three strikes provision of PLRA); *Patton v. Jefferson Corr. Ctr.*, 136 F.3d 458, 464 (5th Cir. 1998) (declining to allow "litigious prisoners to immunize frivolous lawsuits from the 'three strikes' barrier by the simple expedient of pleading unexhausted habeas claims as components of § 1983 suits"); *Shephard v. Edwards*, No. C2-01-563, 2001 WL 1681145, at *1 (S.D. Ohio Aug. 30, 2001) (declining to consolidate prisoner's unrelated various actions so as to allow him to pay one filing fee, because it "would improperly circumvent the express language and clear intent of the 'three strikes' provision"); *Scott v. Kelly*, 107 F. Supp. 2d 706, 711 (E.D. Va. 2000) (denying prisoner's request to add new, unrelated claims to an ongoing civil rights action as an improper attempt to circumvent the PLRA's filing fee requirements and an attempt to escape the possibility of obtaining a "strike" under the "three strikes" rule).  To allow Plaintiff to proceed with improperly joined claims and defendants in a single action would permit him to circumvent the PLRA's filing fee provisions and allow him to avoid having to incur a "strike" for purposes of by § 1915(g), should any of his claims turn out to be frivolous.  Courts are therefore obligated to reject misjoined complaints like Plaintiff's.  *See Owens v. Hinsley*, 635 F.3d 950, 952 (7th Cir. 2011).

Although Defendant Macauley, the warden at RMI, is the first individual listed in the caption of the complaint, Plaintiff makes no allegations against Macauley until close to the end of the complaint, and even then only in relation to his supervisory authority over more recent events.  In contrast, the first Defendant named in the body of the complaint is Defendant CO / Acting Chaplain Otterbein, who is the principal actor in the first set of allegations in the complaint.[3]

---

[3] Plaintiff alleges certain actions against CO Blaunt beginning on August 2, 2017, when Blaunt took over the role of acting chaplain.  Blaunt, however, is not named as a defendant in this action.

In addition to Defendant Otterbein, the first set of allegations concerns Defendants Johnson, Conklin, Gose, and Parrish, between October 2017 and February 28, 2017, related to their involvement in the termination of Plaintiff's position as religious representative, other alleged interference with his religion, harassment, racial discrimination, and retaliation.  Plaintiff makes no further allegations against Defendant Otterbein, and no other conduct by any Defendant is transactionally related to Plaintiff's first set of claims against Defendants Otterbein, Johnson, Conklin, Gose, and Parrish, beyond a sweeping allegation that all of the actions taken by these and the remaining Defendants over the next year-and-a-half were part of a conspiracy and joint campaign of harassment that was formed during the first four months of allegations.

Plaintiff cannot manufacture proper joinder out of a conclusory allegation of conspiracy.  A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action."  *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985)).  The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff.  *Hensley*, 693 F.3d at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).  Moreover, a plaintiff must plead a conspiracy with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

Plaintiff's allegations of conspiracy are conclusory and speculative.   His allegations, even viewed in the light most favorable to Plaintiff, describe at least three discrete sets

of facts that occurred over a period of nearly three years and involved numerous individual officers. Plaintiff has provided no allegations establishing a link between the alleged conspirators or any agreement between them. He relies entirely on an attenuated inference from the mere fact that he has been disciplined by or subjected to objectionable treatment by a variety of prison officials in various circumstances. As the Supreme Court has held, such allegations, while hinting at a "possibility" of conspiracy, do not contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Instead, the Court has recognized that although parallel conduct may be consistent with an unlawful agreement, it is insufficient to state a claim where that conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior." *Iqbal*, 556 U.S. at 680. In light of the far more likely possibility that the various incidents occurring over the long history of Plaintiff's incarceration were unrelated, Plaintiff fails to state a plausible claim of conspiracy. As a consequence, his conclusory claim of conspiracy cannot provide a link between the various sets of allegations that would render his claims beyond February 28, 2018, properly joined.

    Under Rule 21 of the Federal Rules of Civil Procedure, "[m]isjoinder of parties is not a ground for dismissing an action." *Id.* Instead, Rule 21 provides two remedial options: (1) misjoined parties may be dropped on such terms as are just; or (2) any claims against misjoined parties may be severed and proceeded with separately. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572–73 (2004) ("By now, 'it is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time . . . .'") (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989)); *DirecTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006); *Carney v. Treadeau*, No. 2:07-cv-83, 2008 WL 485204, at *2 (W.D. Mich. Feb. 19, 2008); *Coal. to Defend Affirmative Action v. Regents of Univ. of Mich.*, 539 F. Supp. 2d 924, 940 (E.D. Mich. 2008); *see also Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848

F.2d 674, 682 (6th Cir. 1988) ("[D]ismissal of claims against misjoined parties is appropriate."). "Because a district court's decision to remedy misjoinder by dropping and dismissing a party, rather than severing the relevant claim, may have important and potentially adverse statute-of-limitations consequences, the discretion delegated to the trial judge to dismiss under Rule 21 is restricted to what is 'just.'" *DirecTV*, 467 F.3d at 845.

At least three judicial circuits have interpreted "on such terms as are just" to mean without "gratuitous harm to the parties." *Strandlund v. Hawley*, 532 F.3d 741, 745 (8th Cir. 2008) (quoting *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000)); *see also DirecTV*, 467 F.3d at 845. Such gratuitous harm exists if the dismissed parties lose the ability to prosecute an otherwise timely claim, such as where the applicable statute of limitations has lapsed, or the dismissal is with prejudice. *Strandlund*, 532 F.3d at 746; *DirecTV*, 467 F.3d at 846-47.

In this case, Plaintiff brings causes of action under 42 U.S.C. § 1983. For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years. *See* Mich. Comp. Laws § 600.5805(10); *Carroll v. Wilkerson*, 782 F.2d 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999). The statute of limitations begins to run when the aggrieved party knows or has reason to know of the injury that is the basis of his action. *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The statute of limitations, however, is subject to tolling. The Sixth Circuit has recognized that, in prisoner civil rights actions, the statute of limitations is tolled for the period during which a plaintiff's available state administrative remedies were being exhausted. *See Brown v. Morgan*, 209 F.3d 595, 596–97 (6th Cir. 2000).

> The Prison Litigation Reform Act amended 42 U.S.C. § 1997e to provide: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (1999) . . . . This language unambiguously

requires exhaustion as a mandatory threshold requirement in prison litigation. Prisoners are therefore prevented from bringing suit in federal court for the period of time required to exhaust "such administrative remedies as are available."  For this reason, the statute of limitations which applied to Brown's civil rights action was tolled for the period during which his available state remedies were being exhausted.

*Id.* at 596 (citing *Harris v. Hegmann*, 198 F.3d 153, 157–59 (5th Cir. 1999) (per curiam), and

*Cooper v. Nielson*, 194 F.3d 1316, 1999 WL 719514 (9th Cir. 1999)).  Furthermore, "Michigan

law provides for tolling of the limitations period while an earlier action was pending which was

later dismissed without prejudice."  *Kalasho v. City of Eastpointe*, 66 F. App'x 610, 611 (6th Cir.

2003).

Plaintiff's misjoined claims began in August 2018 and continued until October 1,

2019.  With the benefit of tolling during the administrative-exhaustion period, *Brown*, 209 F.3d at

596, and during the pendency of this action, *Kalasho*, 66 F. App'x at 611, Plaintiff has sufficient

time in his limitations period to file new complaints against the remaining Defendants[4] and will

not suffer gratuitous harm if the improperly joined Defendants are dismissed.

The Court therefore will exercise its discretion under Rule 21 and dismiss all

Defendants except Defendants Otterbein, Johnson, Conklin, Gose, and Parrish for those claims

that arose between October 2017 and February 28, 2017, without prejudice to the institution of

new, separate lawsuits against the dismissed Defendants and claims.  *See Coughlin*, 130 F.3d at

1350 ("In such a case, the court can generally dismiss all but the first named plaintiff without

prejudice to the institution of new, separate lawsuits by the dropped plaintiffs"); *Carney*, 2008 WL

485204, at *3 (same).  If Plaintiff wishes to proceed with his dismissed claims against any

Defendant, he shall do so by filing new civil actions on the forms provided by this Court, *see* W.D.

---

[4] Plaintiff is cautioned that his many and varied claims against the dismissed Defendants are not all properly brought in a single action.  Should Plaintiff elect to file new civil actions to present his claims against one or more dismissed Defendants, he may not join in a single action claims against different Defendants that are not transactionally related.

Mich. LCivR 5.6(a), and paying the required filing fee or applying in the manner required by law to proceed *in forma pauperis*.

## III.     Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr.*

*Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## IV.    Supervisory Liability

Plaintiff's only allegation against Defendant RUM Parrish in the relevant period is that Parrish failed to respond to one kite from Plaintiff about Plaintiff's removal from his religious-representative position, alleged religious and racial discrimination, and alleged harassment.  Arguably, he also intends to allege that Defendant Parrish is liable for the actions of his subordinates.

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability.  *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).  A claimed constitutional violation must be based upon active unconstitutional behavior.  *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).  The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act.  *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).  "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.

Plaintiff has failed to allege that Defendant Parrish engaged in any active unconstitutional behavior.  Plaintiff alleges only that he sent a kite to Parrish and that Parrish failed to respond.  As discussed, Plaintiff is not responsible in his supervisory capacity for the actions of his subordinates.  Moreover, § 1983 liability may not be imposed simply because a supervisor

denied an administrative grievance or kite or failed to act based upon information contained in such a grievance or kite. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). Accordingly, Plaintiff fails to state a claim against Defendant Parrish.

## V.    First Amendment

Plaintiff appears to be alleging that Defendants Otterbein, Johnson, Gose, and Conklin discriminated against him and harassed him for his religious beliefs, in violation of the First Amendment.

The First Amendment provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." U.S. Const. amend I. The right to freely exercise one's religion falls within the fundamental concept of liberty under the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Accordingly, state legislatures and those acting on behalf of a state are "as incompetent as Congress" to interfere with the right. *Id.*

While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain the First Amendment protection to freely exercise their religion. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). To establish that this right has been violated, Plaintiff must establish (1) that the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) that Defendant's behavior infringes upon this practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224–25 (6th Cir. 1987); *see also Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same); *Bakr v. Johnson*, No. 95-2348, 1997 WL 428903, at *2 (6th Cir. July 30, 1997) (noting that "sincerely held religious beliefs require accommodation by prison officials").

A practice will not be considered to infringe on a prisoner's free exercise unless it "places[s] a substantial burden on the observation of a central religious belief or practice. . . ."

*Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989); *see also Welch v. Spaulding*, 627 F. App'x 479, 485 (6th Cir. 2015) (McKeague, J., dissenting) ("To violate the First Amendment, the diet must impose a substantial burden on the inmate's exercise of religion."). "[T]he Supreme Court has made clear that the 'substantial burden' hurdle is high." *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007). "[A] 'substantial burden' is a difficult threshold to cross." *Id.* at 736. "'[A] 'substantial burden' must place more than an inconvenience on religious exercise.'" *Id.* at 739 (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)). A particular government action will not be considered a substantial burden merely because it "may make [the] religious exercise more expensive or difficult. . . ." *Id.*

### A. Defendant Conklin

Plaintiff makes a single, conclusory allegation against Defendant Conklin during the period in question:

> C/O Conklin on one occasion threw Plaintiff's religious item on the floor and placed an old padlock (that did not belong to Plaintiff) on the locker then refused to remove it before he went home at 10pm.

(Compl., ECF No. 1, PageID.7.) In his statement of claims, Plaintiff does not even mention a First Amendment claim against Conklin for the described conduct.

Plaintiff's allegation that Defendant Conklin threw an unidentified religious item on the floor at an unspecified time is too conclusory to support any of the elements of a First Amendment claim. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555. Nevertheless, even if the Court were to assume that that the item in question was religious within Plaintiff's beliefs and that throwing the item offended Plaintiff's sincerely held beliefs, Plaintiff's allegation unquestionably fails to allege that the conduct placed a substantial burden on

any of his core religious beliefs.  *Hernandez*, 490 U.S. at 699.  He therefore fails to state a First Amendment claim against Defendant Conklin.

### B.  Defendant Gose

Plaintiff's First Amendment allegations against Defendant Gose are as limited as those against Defendant Conklin.  He states that Defendants Johnson and Gose refused to timely release him for church services on November 16 and 23, 2017, resulting in Plaintiff being late to services twice.

The Court assumes that attendance at group religious services is a religious practice for Plaintiff and that his religious beliefs are sincerely held.  As with Defendant Conklin, however, Plaintiff's allegations fall well short of demonstrating that, by delaying Plaintiff's arrival at group services on two occasions, Defendant Gose placed a substantial burden on Plaintiff's core religious beliefs.  Instead, Plaintiff's allegations show only minor inconvenience and delay to his exercise of a religious practice on two occasions.  Such inconvenience is not a substantial burden.  *Living Water Church*, 258 F. App'x at 739 ("[A] 'substantial burden' must place more than an inconvenience on religious exercise.") (internal quotations omitted).  Plaintiff therefore fails to state a First Amendment claim against Defendant Gose.

### C.  Defendants Johnson & Otterbein

Plaintiff alleges that Defendants Johnson and Otterbein engaged in harassing behavior designed to interfere with Plaintiff's ability to preach to other prisoners, in accordance with his religious beliefs.  Upon initial review, the Court concludes that Plaintiff's allegations against Defendants Johnson and Otterbein are sufficient to state a First Amendment claim.

## VI.   Eighth Amendment

Plaintiff alleges that Defendant Johnson violated the Eighth Amendment when she announced to white prisoners that Plaintiff's self-help book was anti-white and when she told

26

prisoners that Plaintiff was a snitch.  Plaintiff also alleges generally that Defendants Conklin, Johnson, Gose, and Otterbein engaged in a "Campaign of Harassment" and "psychological warfare" against him.  (Compl., ECF No. 1, PageID.20.)

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted).  Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.  "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347).  As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

A.    **Defendant Johnson—labeling as a snitch**

In its prohibition of "cruel and unusual punishments," the Eighth Amendment places restraints on prison officials, directing that they may not use excessive physical force against prisoners and must also "'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).  To establish liability under the Eighth Amendment for a claim based on a failure to

27

prevent harm to a prisoner, a plaintiff must show that the prison official acted with "deliberate indifference" to a substantial risk of serious harm facing the plaintiff. *Farmer*, 511 U.S. at 834; *Helling v. McKinney*, 509 U.S. 25, 32 (1993); *Bishop v. Hackel*, 636 F.3d 757, 766–67 (6th Cir. 2011); *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001); *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996); *Taylor v. Mich. Dep't of Corr.* 69 F.3d 76, 79 (6th Cir. 1995). Deliberate indifference is a higher standard than negligence and requires that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Bishop*, 636 F.3d at 766–67.

Identifying an inmate as an informant or labeling him or her as a "snitch" may constitute deliberate indifference to the safety of the inmate. *See, e.g., Comstock v. McCrary*, 273 F.3d 693, 699, n.2 (6th Cir. 2001) (acknowledging that being labeled a snitch could make the inmate a target for prison attacks); *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001); *see also Odom v. McKenzie*, No. 12-CV-79-HRW, 2012 WL 6214367, at *3 (E.D. Ky. Dec. 13, 2012) (citations omitted). "It does not matter whether the risk is caused by the actions of prison officials or may come at the hands of other inmates. If an inmate is believed to be a 'snitch' by other inmates, he or she faces a substantial risk of assault by other inmates." *Spotts v. Hock*, No. CIV. 10-353-GFVT, 2011 WL 676942, at *2–3 (E.D. Ky. Feb. 16, 2011) (internal citation omitted). However, in at least one published opinion, the Sixth Circuit has held that to state a claim for deliberate indifference under the Eighth Amendment in such a context, a plaintiff must allege, and ultimately establish, that he or she suffered physical harm as a result of being labeled a snitch. *See Thompson v. Mich. Dep't of Corr.*, 25 F. App'x 357, 359 (6th Cir. 2002) (affirming district court's dismissal where plaintiff's claim that he was endangered by being labeled a snitch

was unsupported by any allegation of harm); *Yaklich*, 148 F.3d at 600–01 (plaintiff failed to state an Eighth Amendment claim based upon inmate threats where he alleged no physical injury); *White v. Trayser*, No. 10-CV-11397, 2011 U.S. Dist. LEXIS 31434, 2011 WL 1135552 (E.D. Mich. Mar. 25, 2011) (plaintiff failed to state an Eighth Amendment claim where he alleged that defendant endangered his life by thanking him for information about illegal contraband in the presence of other inmates but failed to allege that he suffered any physical injury); *Catanzaro v. Mich. Dep't of Corr.*, No. 08-11173, 2009 U.S. Dist. LEXIS 108443, at *25, 2009 WL 4250027 (E.D. Mich. Nov. 19, 2009) ("an Eighth Amendment deliberate indifference claim must be grounded in an actual physical injury"); *Gibbs v. Ball*, No. 07-15462, 2009 U.S. Dist. LEXIS 130860, at *9-13 (E.D. Mich. Jan. 12, 2009) (no Eighth Amendment violation where plaintiff was labeled a "rat," but did not show actual physical injury).

That said, in establishing the objective prong of the Eighth Amendment standard, a prisoner ordinarily does not need to prove that he has been the victim of an actual attack to bring a personal-safety claim; instead, he must establish that he reasonably fears such an attack. *Farmer,* 511 U.S. at 834 (holding that the operative determination is whether the prisoner faces a substantial risk of serious harm); *see also Thompson v. Cnty. of Medina*, 29 F.3d 238, 242–43 (6th Cir. 1994) (holding that, in a personal-safety situation, a prisoner does not need to demonstrate that he has been the victim of an actual attack to bring a personal safety claim, but he must establish that he reasonably feared such an attack); *Gresham v. Walczak*, No. 1:20-cv-310, 2020 WL 7872192, at *2 (W.D. Mich. Nov. 30, 2021) (holding that an officer's accusation that a prisoner was a snitch, coupled with a threat of physical harm from a prisoner, was sufficient to state an Eighth Amendment claim).

Here, Plaintiff does not allege that he faced a substantial risk of serious harm or was in reasonable fear for his safety.  Indeed, he suggests that other prisoners did not take

Johnson's statement seriously, but simply informed Plaintiff that Johnson had made the remarks. Plaintiff's factual allegations therefore fall short of establishing the objective prong of the deliberate-indifference standard.

Moreover, even if Plaintiff's allegations supported an Eighth Amendment claim against Defendant Johnson, Plaintiff would not be entitled to relief in this action. The Sixth Circuit repeatedly has held that Eighth Amendment claims for monetary relief based on mental or emotional injury are precluded by 42 U.S.C. § 1997e(e), absent a showing of physical injury. *See, e.g.*, *Jackson v. Herrington*, 493 F. App'x 348, 354 (6th Cir. 2010); *Flanory v. Bonn*, 604 F.3d 249, 254 (6th Cir. 2010). Because Plaintiff has alleged no physical injury arising out of Defendant Johnson's comments, he is not entitled to monetary relief.

In addition, although Plaintiff requests declaratory and injunctive relief from Johnson in his official capacity, Plaintiff's allegations do not support the grant of such relief. Ordinarily, a suit against an individual in his official capacity is equivalent to a suit brought against the governmental entity; in this case, it is the Michigan Department of Corrections. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). Nevertheless, an official-capacity action seeking injunctive relief constitutes an exception to sovereign immunity. *See Ex Parte Young*, 209 U.S. 123, 159–60 (1908) (Eleventh Amendment immunity does not bar prospective injunctive relief against a state official). As the Supreme Court has recognized, a suit under *Ex Parte Young* for prospective injunctive relief is not treated as an action against the state. *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). Instead, the doctrine is a fiction recognizing that unconstitutional acts cannot have been authorized by the state and therefore cannot be considered done under the state's authority. *Id.*

Importantly, "*Ex parte Young* can only be used to avoid a state's sovereign immunity when a 'complaint alleges an ongoing violation of federal law and seeks relief properly

Case 1:21-cv-00254-PLM-SJB   ECF No. 9,  PageID.82   Filed 10/28/21   Page 31 of 39

characterized as prospective.'" *Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020) (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).  Past exposure to illegal conduct does not, by itself, sufficiently prove that the plaintiff will be subject to the illegal conduct again or present a "case or controversy," unless accompanied by continuing, present adverse effects.  *See, e.g., Los Angeles v. Lyons*, 461 U.S. 95 (1983) (injunctive relief); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (declaratory relief); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) (injunctive relief).  A court should assume that, absent an official policy or practice urging unconstitutional behavior, individual government officials will act constitutionally. *Lyons*, 461 U.S. at 102; *O'Shea*, 414 U.S. at 495–96.

In the present action, Plaintiff does not allege the existence of an official policy or practice or suggest that the alleged activity is likely to occur again.  In fact, Plaintiff complains about statements made by Defendant Johnson nearly four years ago.  His allegations relate solely to past harm, not future risk of harm.  Therefore, the possibility that Plaintiff will be subjected to the same allegedly unconstitutional activity is far too speculative to warrant injunctive relief or to deem the alleged activity a continuing violation of federal law.

For both reasons, Plaintiff's Eighth Amendment claim against Defendant Johnson will be dismissed.

B.       **Defendants Conklin, Johnson, Gose, & Otterbein—harassment**

Plaintiff's Eighth Amendment "harassment" claim against Defendants Conklin, Johnson, Gose, and Otterbein consists of a single sentence:  "Defendants Conklin, Johnson, Gose, Otterbein, Ferris and Parrish engaged in psychological warfare by engaging in a Campaign of Harassment . . ." against Plaintiff.  To the extent that Plaintiff intends to repeat his conspiracy allegation—that all of the claims alleged against all of the Defendants are connected by a conspiracy—the Court has rejected the argument and has concluded that the allegations after

31

February 28, 2018, are not properly joined.  Based on this determination, the Court concluded that Defendant Ferris, among others, was improperly joined in the action, as he was not engaged in conduct related to Plaintiff's first set of allegations against Defendant Otterbein.  Further, the Court has already dismissed Defendant Parrish from the action, because Plaintiff's sole allegation against Parrish was one that alleged supervisory liability and failure to respond to a kite.  As a consequence, the only allegations of alleged harassment properly before the Court are those against Defendants Conklin, Johnson, Gose, and Otterbein preceding February 28, 2018.

The Court previously discussed Defendant Johnson's alleged comments to other prisoners about Plaintiffs' self-help book and snitching.  Plaintiff's remaining Eighth Amendment "harassment" allegations against Defendants Conklin, Johnson, Gose, and Otterbein during the relevant period are limited to the following:  Conklin throwing a religious item on the floor; Johnson and Gose delaying Plaintiff's attendance at religious services; Johnson threatening to "take care of [Plaintiff]" because she wanted someone else to lead services; Otterbein discouraging other prisoners from following Plaintiff's religious teachings, discouraging prisoners from joining the Christian Science faith (after Plaintiff did so), and terminating Christian Science services.

While the Court has concluded that Plaintiff's allegations against Defendants Johnson and Otterbein are sufficient to state a First Amendment claim, nothing about his allegations, whether considered alone or together, support an Eighth Amendment claim.  "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson*, 503 U.S. at 9 (quoting *Rhodes*, 452 U.S. at 347).  As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*  Moreover, the use of harassing or degrading language by a prison official, although unprofessional and deplorable, does not rise to constitutional dimensions.  *See Ivey*, 832 F.2d 950, 954–55 (6th Cir. 1987); *see also Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (harassment and verbal abuse do not

32

constitute the type of infliction of pain that the Eighth Amendment prohibits); *Violett v. Reynolds*, No. 02-6366, 2003 WL 22097827, at *3 (6th Cir. Sept. 5, 2003) (verbal abuse and harassment do not constitute punishment that would support an Eighth Amendment claim); *Thaddeus-X v. Langley*, No. 96-1282, 1997 WL 205604, at *1 (6th Cir. Apr. 24, 1997) (verbal harassment is insufficient to state a claim); *Murray v. U.S. Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at *3 (6th Cir. Jan. 28, 1997) ("Although we do not condone the alleged statements, the Eighth Amendment does not afford us the power to correct every action, statement, or attitude of a prison official with which we might disagree."); *Clark v. Turner*, No. 96-3265, 1996 WL 721798, at *2 (6th Cir. Dec. 13, 1996) ("Verbal harassment or idle threats are generally not sufficient to constitute an invasion of an inmate's constitutional rights."); *Brown v. Toombs*, No. 92-1756, 1993 WL 11882 (6th Cir. Jan. 21, 1993) ("Brown's allegation that a corrections officer used derogatory language and insulting racial epithets is insufficient to support his claim under the Eighth Amendment."); *Torres v. Oakland Cnty.*, 758 F.2d 147, 152 (6th Cir. 1985) (the occasional or sporadic use of racial slurs, although unprofessional and reprehensible, does not rise to a level of constitutional magnitude).

Because he alleges only minor allegations of harassing conduct and limited verbal harassment against Defendants Conklin, Johnson, Gose, and Otterbein, Plaintiff fails to state an Eighth Amendment claim against them.

## VII.    Equal Protection

Plaintiff alleges that Defendant Otterbein discriminated against him on the basis of his race by harassing Plaintiff and replacing him as religious representative with a less qualified white prisoner, Mr. St. Andre.  Plaintiff also alleges that Defendants Johnson and Gose treated him differently than white prisoners when they revoked unspecified privileges.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  When a law adversely impacts a "suspect class" such as one defined by race, alienage, or national origin, or invades a "fundamental right" such as speech or religious freedom, the rigorous "strict scrutiny" standard ordinarily governs, whereby such laws "will be sustained only if they are suitably tailored to serve a compelling state interest."  *City of Cleburne*, 473 U.S. at 440.  However, while a convicted prisoner does not forfeit all constitutional protections by virtue of his confinement, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights . . . ."  *Price v. Johnston*, 334 U.S. 266, 285 (1948).  "The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security."  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citing, *inter alia*, *Turner v. Safley*, 482 U.S. 78, 84 (1987)).

To establish a violation of the Equal Protection Clause, an inmate must show that the defendants purposefully discriminated against him.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).  Such discriminatory purpose must be a motivating factor in the actions of the defendants.  *Id.* at 265–66.  "A plaintiff presenting a race-based equal protection claim can either present direct evidence of discrimination, or can establish a prima facie case of discrimination under the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011).

34

With respect to his claim that Defendant Otterbein discriminated against him in favor of a white inmate for the religious-representative position, Plaintiff alleges no facts constituting direct evidence of discriminatory motive or purpose in his termination from the religious-representative position. *See Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011). Moreover, he fails to allege a prima facie claim under the indirect, burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). To establish a prima facie case of discrimination under the *McDonnell Douglas* test, a plaintiff must show that (1) he was a member of a protected class; (2) he was qualified for the job; (3) he was subjected to an adverse employment decision; and (4) he was "replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *See Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (internal quotations omitted). To be a similarly situated member of another class, "the comparative [prisoner] 'must have dealt with the same [decisionmaker], have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it.'" *Umani*, 432 F. App'x at 460 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 586 (6th Cir. 1992).

Plaintiff fails to allege that prisoner St. Andre was similarly situated in all relevant respects. *See Umani*, 432 F. App'x at 458. Although Plaintiff argues that he was more qualified than St. Andre with respect to education, training, and speaking ability, he does not allege that St. Andre had given the same sort of provocative sermons or written a book that, according to Plaintiff's own allegations, staff believed was anti-white" and promoted "radical black ideologies." (Compl., ECF No. 1, PageID.9.) Plaintiff therefore was not similarly situated with prisoner St. Andre.

It is apparent from Plaintiff's allegations that Defendant Otterbein did not like Plaintiff, his preaching style, or the substance of his preaching.  But Plaintiff's allegation of racial discrimination in the appointment of a religious representative is merely conclusory.  Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983.  *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555.  Plaintiff's equal protection claim against Defendant Otterbein therefore will be dismissed.

Plaintiff's one-sentence allegation that Defendants Johnson and Gose treated Plaintiff differently than white prisoners by revoking unspecified privileges is even more conclusory than his allegation of racial discrimination against Defendant Otterbein.  Because he fails to allege any specifics of the "privileges" he was denied or the circumstances of the alleged discrimination, Plaintiff cannot demonstrate that he was qualified to receive the unspecified privileges.  Moreover, Plaintiff alleges no facts concerning a similarly situated comparator of a different racial group who was treated differently—much less that any such person was purposefully treated different.  Plaintiff's conclusory allegation that Defendants Johnson and Gose engaged in racial discrimination therefore fails to state an equal protection claim.

## VIII.   Retaliation

Although he raises his allegations as an ostensible violation of his right to access the courts, Plaintiff alleges a single retaliation claim related to the events preceding February 28, 2018:  he claims that Defendants Conklin, Johnson, Gose, and Otterbein engaged in a campaign of harassment in retaliation for Plaintiff having objected to volunteer Vander Jagt's allegedly defamatory comments about Plaintiff.

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements:

36

(1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Id.*  Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence.  *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987).  "[A]lleging merely the ultimate fact of retaliation is insufficient."  *Murphy*, 833 F.2d at 108.  "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987)); *see also Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003) (in complaints screened pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial") (internal quotations omitted); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) ("[B]are allegations of malice on the defendants' parts are not enough to establish retaliation claims" that will survive § 1915A screening) (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998)).

Plaintiff merely alleges the ultimate fact of retaliation in this action.  He has presented no facts whatsoever to support his conclusion that any Defendant retaliated against him because of his kites or grievances.  His retaliation claim therefore will be dismissed.

## IX.   Pending motion

Plaintiff has filed a motion to appoint counsel.  Indigent parties in civil cases have no constitutional right to a court-appointed attorney.  *Abdur-Rahman v. Mich. Dep't of Corr.*, 65

F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604–05 (6th Cir. 1993).  The Court may, however, request an attorney to serve as counsel, in the Court's discretion.  *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604–05; *see Mallard v. U.S. Dist. Ct.*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances.  In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiff's apparent ability to prosecute the action without the help of counsel.  *See Lavado*, 992 F.2d at 606.  The Court has carefully considered these factors and determines that, at this stage of the case, the assistance of counsel does not appear necessary to the proper presentation of Plaintiff's position.  Plaintiff's request for appointment of counsel (ECF No. 2) is therefore will be denied.

## Conclusion

Having reviewed Plaintiff's complaint under Rule 21 of the Federal Rules of Civil Procedure, the Court will dismiss without prejudice as misjoined Plaintiff's claims against Defendants Macauley, Blackman, McBride, Hadden, Normington, Ferris, Neimic, Jones, Kowatch, Garza-Martin, Langdon, and Sices, as well as Plaintiff's claims against remaining Defendants Johnson, Conklin, and Parrish, that occurred after February 28, 2018.  Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Parrish, Gose, and Conklin will be dismissed for failure to state a claim, under 28 U.S.C. § 1915A(b), and 42 U.S.C. § 1997e(c).  The Court will also dismiss, for failure to state a claim, Plaintiff's equal protection, Eighth Amendment, and retaliation claims against remaining Defendants Otterbein and Johnson.  The Court also will deny Plaintiff's motion to appoint counsel. Plaintiff's First Amendment claims against Defendants Otterbein and Johnson remain in the case.

An order consistent with this opinion will be entered.


Dated:    October 28, 2021                              /s/ Paul L. Maloney
                                                        Paul L. Maloney
                                                        United States District Judge